IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

Ronald H.,[1]                                              No. 3:22-cv-00715-HZ

               Plaintiff,                           OPINION & ORDER

      v.

COMMISSIONER, SOCIAL
SECURITY ADMINISTRATION,

               Defendant.

Caitlin S. Laumaker
George J. Wall
Law Offices of George J. Wall
825 NE 20th Ave Ste 330
Portland, OR 97232

       Attorney for Plaintiff

Kevin Danielson
Assistant United States Attorney
District of Oregon
1000 SW Third Avenue, Suite 600
Portland, OR 97204

---

[1] In the interest of privacy, this Opinion uses only the first name and the initial of the last name of the non-governmental party or parties in this case. Where applicable, this Opinion uses the same designation for a non-governmental party's immediate family member.

1 – OPINION & ORDER

Lars J. Nelson
Special Assistant United States Attorney
Social Security Administration
Office of the General Counsel
6401 Security Blvd
Baltimore, MD 21235

      Attorneys for Defendant

HERNÁNDEZ, District Judge:

      Plaintiff Ronald H. brings this action seeking judicial review of the Commissioner's final decision to deny disability insurance benefits ("DIB"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). The Court reverses the Commissioner's decision and remands this case for further administrative proceedings.

## PROCEDURAL BACKGROUND

      Plaintiff applied for DIB on March 20, 2019, alleging an onset date of May 9, 2017. Tr. 13.[2] Plaintiff's date last insured ("DLI") is December 31, 2022. Tr. 15. His application was denied initially and on reconsideration. Tr. 13.

      On January 11, 2021, Plaintiff appeared with counsel for a hearing before an Administrative Law Judge ("ALJ"). Tr. 13. On April 15, 2021, the ALJ found Plaintiff not disabled. Tr. 26. The Appeals Council denied review. Tr. 1.

## FACTUAL BACKGROUND

      Plaintiff originally alleged disability based on inflammatory arthritis. Tr. 228. At the time of his alleged onset date, he was 55 years old. Tr. 23. He has at least a high school education and

---

[2] Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record, filed herein as Docket No. 7.

past relevant work experience as a machinist, retail manager, sheet metal worker, heating and air conditioning installer/servicer, sheet metal supervisor, and project manager. Tr. 22-23.

## SEQUENTIAL DISABILITY EVALUATION

A claimant is disabled if they are unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). Disability claims are evaluated according to a five-step procedure. *See Valentine v. Comm'r*, 574 F.3d 685, 689 (9th Cir. 2009) (in social security cases, agency uses five-step procedure to determine disability). The claimant bears the ultimate burden of proving disability. *Id.*

In the first step, the Commissioner determines whether a claimant is engaged in "substantial gainful activity." If so, the claimant is not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520(b), 416.920(b). In step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments." *Yuckert*, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c). If not, the claimant is not disabled. *Id.*

In step three, the Commissioner determines whether the claimant's impairments, singly or in combination, meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Yuckert*, 482 U.S. at 141; 20 C.F.R. §§ 404.1520(d), 416.920(d). If so, the claimant is conclusively presumed disabled; if not, the Commissioner proceeds to step four. *Yuckert*, 482 U.S. at 141.

In step four, the Commissioner determines whether the claimant, despite any impairment(s), has the residual functional capacity (RFC) to perform their "past relevant work."

20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can perform past relevant work, the claimant is not disabled. If the claimant cannot perform past relevant work, the burden shifts to the Commissioner. In step five, the Commissioner must establish that the claimant can perform other work. *Yuckert*, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). If the Commissioner meets their burden and proves that the claimant can perform other work that exists in the national economy, then the claimant is not disabled. 20 C.F.R. §§ 404.1566, 416.966.

## THE ALJ'S DECISION

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity after his alleged onset date. Tr. 15. Next, at steps two and three, the ALJ determined that Plaintiff has the following severe impairments: "obesity, right carpal tunnel syndrome status post surgery, sleep apnea treated with CPAP, fibromyalgia syndrome, and a left meniscal tear." Tr. 15. However, the ALJ determined that Plaintiff's impairments did not meet or medically equal the severity of a listed impairment. Tr. 16. At step four, the ALJ concluded that Plaintiff has the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) with the following limitations:

> the claimant can frequently climb ramps and stairs and occasionally climb ladders, ropes or scaffolds and can occasionally balance, stoop, kneel, crouch, and crawl, and can frequently handle and finger with right upper extremity and avoid concentrated exposure to vibration and work hazards, such as moving machinery and unprotected heights.

Tr. 17. Because of these limitations, the ALJ concluded that Plaintiff could not perform his past relevant work. Tr. 22-23. But at step five, the ALJ found that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, such as "distributing

clerk," "returns clerk," "sales representative, hardware," and "sales person, general hardware." Tr. 25. Thus, the ALJ concluded that Plaintiff is not disabled. Tr. 26.

## STANDARD OF REVIEW

A court may set aside the Commissioner's denial of benefits only when the Commissioner's findings "are based on legal error or are not supported by substantial evidence in the record as a whole." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (internal quotation marks omitted). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks omitted). The court considers the record as a whole, including both the evidence that supports and detracts from the Commissioner's decision. *Id.*; *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007). "Where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be affirmed." *Vasquez*, 572 F.3d at 591 (internal quotation marks and brackets omitted); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007) ("Where the evidence as a whole can support either a grant or a denial, [the court] may not substitute [its] judgment for the ALJ's.") (internal quotation marks omitted).

## DISCUSSION

Plaintiff asserts that the ALJ erred by (1) improperly rejecting his subjective symptom testimony, (2) failing to fully address the medical opinion of Dr. Elisabeth Jappay, (3) failing to include all supported limitations in the RFC, and (4) failing to properly conduct a transferable skills analysis. Pl. Op. Br. 5, ECF 25. The Court concludes that this case must be remanded for further administrative proceedings.

## I.    Subjective Symptom Testimony

The ALJ is responsible for evaluating symptom testimony. SSR 16-3p, 2017 WL 5180304, at *1 (Oct. 25, 2017). The ALJ engages in a two-step analysis for subjective symptom evaluation. *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) (superseded on other grounds). First, the ALJ determines whether there is "objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* (internal quotations omitted). Second, "if the claimant has presented such evidence, and there is no evidence of malingering, then the ALJ must give specific, clear and convincing reasons in order to reject the claimant's testimony about the severity of the symptoms." *Id.* (internal quotations omitted).

When evaluating subjective symptom testimony, "[g]eneral findings are insufficient." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) (quoting *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995)). "An ALJ does not provide specific, clear, and convincing reasons for rejecting a claimant's testimony by simply reciting the medical evidence in support of his or her residual functional capacity determination." *Brown-Hunter v. Colvin*, 806 F.3d 487, 489 (9th Cir. 2015). Instead, "the ALJ must specifically identify the testimony she or he finds not to be credible and must explain what evidence undermines the testimony." *Holohan v. Massanari*, 246 F.3d 1195 (9th Cir. 2001); *see also Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (The reasons proffered must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discount the claimant's testimony.").

Plaintiff was part-owner of a business until approximately February 2017, when he sold his shares over disagreements with the other owners. Tr. 41. He testified that he wakes up around 6:30 in the morning and cannot sleep longer because of pain in his legs, hips, and back. Tr. 74.

He described the pain as "pretty widespread." Tr. 74. Plaintiff testified that after getting up, he takes his medications and sits in his recliner until they take effect. Tr. 74. He testified that he cannot do anything until his medications dull the pain. Tr. 74. Plaintiff wrote in his function report that he can manage his personal care, but it takes twice as long as it used to. Tr. 262. He stated that he prepares meals three times per week. Tr. 262. He testified that he does chores around the house. Tr. 74. These chores include cleaning, mopping, mowing, and household repairs. Tr. 263. Plaintiff stated that he goes outside two or three times daily and shops for groceries and clothes in stores once or twice a week. Tr. 263.

Plaintiff testified that the combination of his pain, fatigue, and shortness of breath was the most debilitating for him. Tr. 76. He testified that he gets fatigued, and it worsens his breathing. Tr. 74. He testified that he can do one hour of strenuous activity per day, "a couple hours" of moderate activity per day, or "about four hours" of light activity per day. Tr. 74. He testified that he needs to take breaks. Tr. 74. He has pain in his knees and thinks it is getting worse. Tr. 79. He has arthritis in multiple joints. Tr. 80. He has pain with certain movements, such as holding a phone or twisting. Tr. 81. He testified that he works in the garden during the summer but cannot garden and go for a walk in the same day. Tr. 74. He stated, "if I do too much, the next day is worse." Tr. 74. He testified that his doctor told him he needed to rest every other day. Tr. 75. He testified that when he is fatigued, he cannot do anything other than sit. Tr. 75. He stated that on some days he could climb a ladder and on other days he could not. Tr. 75-76.

Plaintiff also testified to other symptoms. He testified that his medications affect his thinking. Tr. 75. He stated that sometimes he had trouble finding the right words. Tr. 75. He also testified that one of his medications made him dizzy. Tr. 75. Plaintiff testified that he was losing muscular control and that "I drop stuff all the time." Tr. 75. He stated that he had trouble opening

the bottles for his medications. Tr. 78. He stated that he would drop or spill things when cooking. Tr. 262. However, he also testified he could shoot a gun and turn a wrench for a short period of time. Tr. 78.

Plaintiff testified that when he went on recent hunting trips, his brothers had to carry his gun and his backpack for him. Tr. 75. He stated that he did not hunt two days in a row. Tr. 77. He limited himself to one hour of hiking every other day. Tr. 77. He cannot hike up a hill longer than one hour. Tr. 77. If he works on his car, he takes a break between tasks. Tr. 77. Plaintiff testified that sometimes he will feel better and then the next month he will feel worse. Tr. 80. Plaintiff also stated, "I probably try harder at things I like than I don't like." Tr. 85.

The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the symptoms Plaintiff alleged, but concluded that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" Tr. 18. In reaching this conclusion, the ALJ relied on Plaintiff's daily activities, reason for leaving work, improvement with treatment, and the objective medical record. Tr. 18.

A.    Activities of Daily Living

The ALJ found that Plaintiff's testimony was inconsistent with some of his activities of daily living. Tr. 18. Contradiction with a claimant's activities of daily living is a clear and convincing reason for rejecting a claimant's testimony. *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008). There are two grounds for using daily activities to support an adverse credibility determination: (1) when activities meet the threshold for transferable work skills, and (2) when activities contradict a claimant's other testimony. *Orn v. Astrue,* 495 F.3d 625, 639 (9th Cir. 2007). In order to impact a claimant's credibility, the activity has to be "inconsistent with

claimant's claimed limitations." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998). The ALJ cannot mischaracterize statements and documents in the record or take these out of context in order to reach his or her conclusion on the claimant's credibility. *Id.* at 722-23. In addition, the claimant's ability to perform limited basic daily activities is not a clear and convincing reason to reject a claimant's testimony. *See id.* at 722 ("[D]isability claimants should not be penalized for attempting to lead normal lives in the face of their limitations."); *Webb v. Barnhart*, 433 F.3d 683, 688 (9th Cir. 2005) ("The mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from [his] credibility as to [his] overall disability. One does not need to be utterly incapacitated in order to be disabled.") (internal quotation omitted).

The ALJ found that Plaintiff's symptom testimony was inconsistent with his activities: "travel, hunting, fishing, car maintenance, gardening, and walking." Tr. 18. Plaintiff argues that the ALJ ignored his testimony that while he could do these activities, he could only do them for short periods of time with breaks, and he could only do physical activity every other day. Pl. Op. Br. 7-8. The Court concludes that Plaintiff's activities contradict his assertion that he can only exercise every other day, but they do not contradict his testimony that he needs breaks throughout the day between physical activities.

Plaintiff testified that when he went on hunting trips, he only hunted or hiked every other day. Tr. 77. The ALJ also noted that Plaintiff reported going for a walk every evening. Tr. 20. Plaintiff told his primary care provider in February 2020 that he was in the habit of going for a walk every evening. Tr. 821. On the other hand, Plaintiff told his primary care provider that when he tried to do both yard work and regular walks in the same day, he was "in severe pain."

Tr. 813. Ultimately, the ALJ did not err in concluding that Plaintiff's activities undermined his assertion that he could only engage in physical activity every other day.

But Plaintiff consistently reported that he took breaks throughout the day. He testified that he can do one hour of strenuous activity per day, "a couple hours" of moderate activity per day, or "about four hours" of light activity per day. Tr. 74. He testified that he needs to take breaks during that time. Tr. 74. He testified at his hearing that he has to take breaks when working on his car. Tr. 77. He testified that when he went on hunting trips, he limited himself to one hour of hiking every other day. Tr. 77. His brothers carried his gun and backpack for him. Tr. 75. His testimony is consistent with his report to his doctor that he could not garden and do yard work in the same day without experiencing severe pain. Tr. 813.

The ALJ stated, "The claimant is an avid bird hunter and works on cars, so he can clearly fire a shotgun, absorb a shotgun blast and hold a gun without harming anyone." Tr. 18. At the hearing, the ALJ told Plaintiff that he saw an inconsistency between Plaintiff's testimony about having trouble gripping things and pain in his shoulders and Plaintiff's testimony that he was still hunting. Tr. 83. The ALJ stated that firing a gun required handling the weapon and "the reverberation from the gun into your shoulder." Tr. 84. Plaintiff's testimony is consistent in that he reported being able to do his activities with breaks, and that some days were more difficult than others. This is normal for individuals diagnosed with fibromyalgia, as the Commissioner has recognized. *Soc. Sec. Ruling, Ssr 12-2p; Titles II & Xvi: Evaluation of Fibromyalgia*, SSR 12-2P, 2012 WL 3104869, at *6 (S.S.A. July 25, 2012) ("For a person with FM, we will consider a longitudinal record whenever possible because the symptoms of FM can wax and wane so that a person may have 'bad days and good days.'"). The ALJ erred in discounting Plaintiff's pain

testimony based on his ability to hunt. But the ALJ reasonably concluded that if Plaintiff felt he could safely handle a firearm, his manipulative limitations were less severe than he claimed.

In sum, the ALJ reasonably relied on Plaintiff's activities in discounting his testimony that he could only exercise every other day and in discounting Plaintiff's testimony about his manipulative limitations. But Plaintiff's activities do not undercut his testimony that he needs frequent breaks between his activities each day or that he cannot engage in more rigorous activities such as hunting and hiking more often than every other day.

B.    Reason for Leaving Work

The ALJ stated that "the claimant appears to have left his last job because he sold his share of the business secondary to a dispute over how much debt to carry rather than related to his medically determinable impairments." Tr. 18. An ALJ may consider evidence that the claimant stopped working for a reason other than disability. *Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008) (holding that ALJ did not err in concluding that claimant may not have been motivated to work because he had $97,000 in savings); *Bruton v. Massanari*, 268 F.3d 824, 828 (9th Cir. 2001), *as amended* (Nov. 9, 2001) (holding that ALJ reasonably discounted claimant's testimony where claimant stated at the hearing and in a doctor's appointment that he left his job because he was laid off, not because he was injured).

Plaintiff testified that he left his most recent job around February 2017 because of a disagreement with the other owners of the business he co-ran. Tr. 41. He explained that "[t]hey wanted to borrow a couple million dollars and put more machinery on the floor and I wanted to pay off all our existing million" in loans. Tr. 41. He then sold his shares and left the business. Tr. 41. In his disability report, Form SSA-3368, Plaintiff stated that he stopped working because of his conditions and because of other reasons. Tr. 228. In the explanation section, he wrote, "Sold

my business Relocated to new state, unable to work due to pain, shortness of breath and

stamina." Tr. 228. The ALJ did not err in concluding that Plaintiff left his job because of a

business dispute. This finding reasonably undercuts Plaintiff's testimony about the severity of his

symptoms during the early period of his alleged disability. To the extent that Plaintiff alleges

worsening symptoms over time, the reason for leaving his job ceases to be a clear and

convincing reason to discount his symptom testimony.

C.    Effects of Medication

The ALJ relied on treatment notes showing that Plaintiff's fibromyalgia pain improved

with medication. Tr. 18. Relevant factors for the ALJ to consider when evaluating symptom

testimony include "[t]he type, dosage, effectiveness, and side effects of any medication" the

plaintiff takes to alleviate symptoms. 20 C.F.R. § 404.1529(c)(3)(iv). "[E]vidence of medical

treatment successfully relieving symptoms can undermine a claim of disability." *Wellington v.*

*Berryhill*, 878 F.3d 867, 876 (9th Cir. 2017). *See also Perry H. v. Saul*, No. 1:19-CV-00050-AA,

2020 WL 2764614, at *5 (D. Or. May 27, 2020).

In February 2020, Plaintiff reported to his primary care provider that with Lyrica, his

tendon pain had decreased by about 50%, going from "horrible" to "mild." Tr. 821. But he also

reported that Lyrica did not help his hip, shoulder, right elbow, or left knee pain at all. Tr. 821.

He reported that he was stiff in the morning when he woke up. Tr. 821. At an appointment with a

different provider later that month, Plaintiff reported his pain worsened to a 7/10 with physical

activity and improved to a 3/10 with medications and moving. Tr. 834. He reported that a

combination of walking, Tylenol, anti-inflammatory medication, and narcotics reduced his pain.

Tr. 834. The record reflects that Plaintiff's medications were partially effective. This is

consistent with Plaintiff's testimony that he waits for his medications to take effect in the morning and that he can do physical activities with breaks.

The ALJ also noted that while Plaintiff testified that Lyrica affected his thinking, the medical record showed only minor mental impairment. Tr. 18. At the hearing, Plaintiff said, "The drugs affect my thinking. I have difficulty finding the right words sometimes." Tr. 75. Plaintiff's primary care provider recorded after an October 2019 appointment that Plaintiff had "noticed some mild cognitive side effects on the Lyrica, but is willing to tolerate those in exchange for the pain benefit." Tr. 682. Occasional searching for words is a mild cognitive side effect. Plaintiff's testimony is consistent with the side effects reported to his physician. In sum, the ALJ erred in relying on the effects (positive and negative) of Plaintiff's medication in discounting his symptom testimony.

### D.    Objective Medical Evidence

The ALJ found that some of Plaintiff's testimony was unsupported by or inconsistent with the medical record. Tr. 18. An ALJ may discount a claimant's testimony based on a lack of support from objective medical evidence, but this may not be the sole reason. *See Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005) (holding that "an ALJ may not reject a claimant's subjective complaints based solely on a lack of medical evidence to fully corroborate the alleged severity of pain."); *Taylor v. Berryhill*, 720 F. App'x 906, 907 (9th Cir. 2018) (explaining that a "lack of objective medical evidence cannot be the sole reason to discredit claimant's testimony," and therefore holding that the ALJ failed to provide clear and convincing reasons for discounting the claimant's testimony) (citation omitted); *Heltzel v. Comm'r of Soc. Sec. Admin.*, No. 19-1287, 2020 WL 914523, at *4 (D. Ariz. Feb. 26, 2020) (stating that "[b]ecause the ALJ's other reasons for rejecting Plaintiff's testimony were legally insufficient, a mere lack of objective

support, without more, is insufficient to reject Plaintiff's testimony."). However, "[w]hen objective medical evidence in the record is *inconsistent* with the claimant's subjective testimony, the ALJ may indeed weigh it as undercutting such testimony." *Smartt v. Kijakazi*, 53 F.4th 489, 498 (9th Cir. 2022).

The ALJ relied on findings that Plaintiff had normal strength and gait. Tr. 18. A medical exam in March 2018 showed strength of 5/5. Tr. 476. Plaintiff's gait was described as normal in February 2020. Tr. 823. At a medical exam in October 2020, Plaintiff's gait was described as "efficient nonantalgic." Tr. 773. Defendant points to similar findings throughout the medical record. Def. Br. 6, ECF 27 (citing Tr. 439, 473, 483, 494, 602, 605, 675, 679, 683, 760, 768, 814, 818, 823). Defendant also points to imaging results showing "only mild degeneration and negative laboratory testing," on which the ALJ also relied. *Id.* (citing Tr. 798, 826, 828-32, 487, 825). The ALJ also relied on the results of musculoskeletal exams such as Spurling's testing. Tr. 19.

The ALJ's reliance on this evidence is inconsistent with his recognition of Plaintiff's fibromyalgia as a severe impairment. Tr. 15. The Ninth Circuit has emphasized that fibromyalgia is an unusual disease. *Revels v. Berryhill*, 874 F.3d 648, 656 (9th Cir. 2017). "What is unusual about the disease is that those suffering from it have muscle strength, sensory functions, and reflexes [that] are normal." *Id.* (internal quotations omitted). Joints will appear normal, and exams do not show objective joint swelling. *Id.* Plaintiff's primary care provider wrote in November 2018, "I think it's becoming clearer that the majority of the patient's pain is fibro." Tr. 823. The ALJ recognized that according to Plaintiff's physician, most of Plaintiff's symptoms were due to fibromyalgia pain, not another condition such as inflammatory arthritis. Tr. 16. Indeed, the ALJ found inflammatory arthritis non-medically determinable because

fibromyalgia was the correct diagnosis. Tr. 16. It follows that the ALJ erred in relying on objective findings involving strength, gait, and inflammation, which would be relevant if Plaintiff's pain were due to inflammatory arthritis, but are not relevant to Plaintiff's fibromyalgia. The ALJ likewise erred in relying on musculoskeletal exams, because such exams do not yield reliable results for patients suffering from fibromyalgia. *See Revels*, 874 F.3d at 656. The objective medical record was not a clear and convincing reason to reject Plaintiff's testimony about his pain and stiffness.

The ALJ noted that Plaintiff's shortness of breath had "no autoimmune or inflammatory etiology." Tr. 20. It is unclear whether the ALJ discounted Plaintiff's testimony about shortness of breath, given how briefly he addressed this symptom. To the extent he did, this was erroneous because there was no other clear and convincing reason to discount the testimony. Thus, a lack of clear etiology in the medical record cannot serve as a clear and convincing reason to discount this testimony.

In sum, substantial evidence supports the ALJ's conclusion that Plaintiff is not limited to physical activity every other day. But substantial evidence does not support the ALJ's rejection of Plaintiff's testimony that he needs frequent breaks throughout the day between chores and physical activities. The ALJ did not address Plaintiff's testimony about his need for such breaks in posing the hypothetical to the vocational expert ("VE"). It is unclear whether Plaintiff can perform light work for 40 hours per week.

## II.     Medical Opinion Evidence

Plaintiff argues that the ALJ failed to address the medical opinion of his treating provider, Dr. Elisabeth Jappay. Pl. Op. Br. 8. For claims filed on or after March 27, 2017, ALJs are no longer required to give deference to any medical opinion, including treating source

opinions. Rules Regarding the Evaluation of Medical Evidence, 2017 WL 168819, 82 Fed. Reg. 5844-01 (Jan. 18, 2017); 20 C.F.R. §§ 404.1520c, 416.920c. Instead, the agency considers several factors. 20 C.F.R. §§ 404.1520c(a), 416.920c(a). These are: supportability, consistency, relationship to the claimant, specialization, and "other factors." 20 C.F.R. §§ 404.1520c(c)(1)-(5), 416.920c(c)(1)-(5). The "most important" factors in the evaluation process are supportability and consistency. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).

Under this framework, the ALJ must "articulate . . . how persuasive [they] find all of the medical opinions" from each doctor or other source. 20 C.F.R. §§ 404.1520c(b), 416.920c(b)(2). In doing so, the ALJ is required to explain how supportability and consistency were considered and may explain how the other factors were considered. 20 C.F.R §§ 404.1520c(b)(2), 416.920c(b)(2). When two or more medical opinions or prior administrative findings "about the same issue are both equally well-supported . . . and consistent with the record . . . but are not exactly the same," the ALJ is required to explain how the other factors were considered. 20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3). "Even under the new regulations, an ALJ cannot reject an examining or treating doctor's opinion as unsupported or inconsistent without providing an explanation supported by substantial evidence." Woods v. Kijakazi, 32 F.4th 785, 792 (9th Cir. 2022).

Dr. Jappay did not perform a formal functional assessment of Plaintiff. Rather, in her treatment notes, she made recommendations about Plaintiff's activity level. Dr. Jappay stated that "Fibro[myalgia] pain is greatly improved with exercise, which needs to be paced, such as every other day." Tr. 603. In another treatment note, she stated, "I recommend an exercise program every other day, such as swimming in a heated pool." Tr. 684. In a third treatment note,

Dr. Jappay stated, "I recommend physical activity every other day, and not more activity than what will raise pain levels by more than 2/10." Tr. 814.

Defendant argues that the ALJ did not need to address Dr. Jappay's exercise recommendations because they do not meet the regulatory definition of a medical opinion. Def. Br. 9-10. Even if Dr. Jappay's recommendations qualify as a medical opinion under the regulations, the ALJ did not err because Dr. Jappay did not state that Plaintiff should not exercise more frequently than every other day—she recommended exercising every other day. The limitation Dr. Jappay recommended was not to engage in activity that would raise Plaintiff's pain levels by more than 2/10. Tr. 814. The ALJ did not err in his handling of Dr. Jappay's treatment notes.

## III.    RFC Assessment

Plaintiff argues that the ALJ failed to include all functional limitations in the RFC. Pl. Op. Br. 10. The RFC is the most a person can do, despite his or her physical or mental impairments. 20 C.F.R. § 404.1545(a). In formulating an RFC, the ALJ must consider all medically determinable impairments, including those that are not "severe," and evaluate "all of the relevant medical and other evidence," including the claimant's testimony. *Id.*; SSR 96-8p, *available at* 1996 WL 374184. In determining a claimant's RFC, the ALJ is responsible for resolving conflicts in the medical testimony and translating the claimant's impairments into concrete functional limitations in the RFC. *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1174 (9th Cir. 2008). Only limitations supported by substantial evidence must be incorporated into the RFC and, by extension, the dispositive hypothetical question posed to the VE. *Osenbrock v. Apfel*, 240 F.3d 1157, 1163-65 (9th Cir. 2001). An "RFC that fails to take into account a claimant's limitations is defective." *Valentine*, 574 F.3d at 690.

Plaintiff argues that the ALJ failed to include a limitation of engaging in physical activity no more than every other day. Pl. Op. Br. 10. He argues that with this limitation, the finding that he could perform light work is erroneous. *Id.* Plaintiff relies on his symptom testimony and Dr. Jappay's exercise recommendation. *Id.* As discussed above, Dr. Jappay's treatment notes do not show that Plaintiff can only engage in physical activity every other day, and the ALJ reasonably discounted Plaintiff's testimony that he could only engage in physical activity every other day. Thus, the ALJ did not err in omitting such a limitation from the RFC. But it is not clear from the record whether a lesser limitation should have been included. The ALJ erred in rejecting Plaintiff's testimony that he needed to take breaks between activities throughout the day. In light of this, it is unclear whether Plaintiff could perform light work for 40 hours per week. This issue requires a remand to resolve.

**IV.    Transferable Skills Analysis**

Plaintiff argues that the ALJ erred in conducting the transferable skills analysis. Pl. Op. Br. 10. The ALJ found that Plaintiff had acquired work skills from his past relevant work. Tr. 23. At step five, the ALJ considers the "vocational factors" of the claimant's age, education, and past work experience, along with the claimant's RFC, to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. *Barnhart v. Thomas*, 540 U.S. 20, 25 (2003); 20 C.F.R. §§ 404.1520(g), 416.920(a)(4)(v), 416.960(c). "There are two ways for the Commissioner to meet the burden of showing that there is other work in 'significant numbers' in the national economy that claimant can perform: (a) by the testimony of a vocational expert, *or* (b) by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2." *Tackett v. Apfel*, 180 F.3d 1094, 1100-01 (9th Cir. 1999).

For an individual with Plaintiff's vocational factors—age, education, work experience, and inability to perform past relevant work—and a light RFC, whether they are disabled depends on whether Plaintiff's skills are "readily transferable to a significant range of semi-skilled or skilled work." 20 C.F.R. pt. 404, subpt. P, app. 2, Rule 202.00(c), 202.07; *see also Lounsburry v. Barnhart*, 468 F.3d 1111, 1116-17 (9th Cir. 2006), as amended (Nov. 7, 2006) (finding under these rules that the plaintiff would be disabled if their skills "are not readily transferable to a significant range of semi-skilled or skilled work"). The regulations define transferable skills as:

> [S]kills that can be used in other jobs, when the skilled or semi-skilled work activities you did in past work can be used to meet the requirements of skilled or semi-skilled work activities of other jobs or kinds of work. This depends largely on the similarity of occupationally significant work activities among different jobs.

20 C.F.R. § 404.1568(d)(1). Transferability is more likely among jobs that require the same or a lesser degree of skill, use the same or similar tools and machines, and involve the same or similar raw materials, products, processes, or services. *Id.* at (d)(2). "A complete similarity of all three factors is not necessary for transferability." *Id.* at (d)(3). Skills are not considered transferable when they "are so specialized or have been acquired in such an isolated vocational setting (like many jobs in mining, agriculture, or fishing) that they are not readily usable in other industries, jobs, and work settings." *Id.* The ALJ must make specific findings on transferable skills even when relying on the testimony of a VE. *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1225 (9th Cir. 2009).

Plaintiff has a work history as a machinist. Between 2006 and 2007, Plaintiff worked as a project superintendent at Overlake Hospital. Tr. 37. He ran the sheet metal division on the job site. Tr. 37. His duties included hiring and firing, making sure materials were delivered, and laying the material for installation, as well as participating in the installation. Tr. 37. He stated the job was 50% or more physical work. Tr. 38. He managed about 16-20 people. Tr. 45. In

2008, Plaintiff worked for Harrison & Hart as an installer. Tr. 38. Plaintiff worked at TI

Northwest Corp. as a sheet metal installer and also a superintendent or foreman. Tr. 38-39. He

also sometimes worked as a project management estimator. Tr. 39. Plaintiff left TI Northwest

and joined Killer Innovations in or about 2013, and remained until 2017. Tr. 39. He became a

one-third owner. Tr. 39. He worked six days per week at the machine shop in the beginning. Tr.

40. Plaintiff testified that between 2013 and 2015, he "was doing nothing but machine shooting"

for 10 hours per day. Tr. 42. In 2015, the business hired more workers and Plaintiff worked in

the office with finance and purchasing part-time and in the shop part-time. Tr. 42. His office

duties included delivering orders to and accepting orders from clients, inputting orders on the

computer, and ensuring the shop had all the necessary materials. Tr. 44. He also wrote purchase

orders and approved checks and payments. Tr. 44. Plaintiff sold his shares in 2017 over a

disagreement with the other partners about incurring additional debt. Tr. 41.

The VE concluded that some of Plaintiff's positions were composite jobs. Tr. 49.

Plaintiff's job at Killer Innovations was best captured by the positions of machinist and retail

manager. Tr. 49-50. His other composite job was a composite of sheet metal worker, heating and

air conditioning installer and servicer, and project manager. Tr. 49-52. *See also* Tr. 58-59

(summarizing findings). The VE found the position of heating and air conditioning installer and

servicer an imperfect fit, but could not find anything closer. Tr. 53-54. The ALJ relied on the

VE's testimony in characterizing Plaintiff's past relevant work. Tr. 22-23. Based on the VE's

testimony, the ALJ found that Plaintiff's skills transferred to the following four jobs: Distributing

Clerk, DOT 222.587-018; Returns Clerk, DOT 209.587-042; Sales Representative, Hardware,

DOT 274.357-034; and Sales Person, General Hardware, DOT 279.357-050. Tr. 23.

Plaintiff argues that the ALJ did not adequately specify what skills Plaintiff acquired from his past work that are readily transferable to the identified jobs. Pl. Op. Br. 11. With respect to the Distributing Clerk and Returns Clerk jobs, the ALJ stated that Plaintiff "has experience taking merchandise or products and putting orders together." Tr. 23. The ALJ stated that Plaintiff "would see work orders and prepare tools and materials for a job, which is similar to Distributing Clerk work." Tr. 23. The ALJ stated that the same skills and experience would permit Plaintiff to work as a Returns Clerk. Tr. 23. The ALJ did specify which skills Plaintiff had acquired that would allow him to work as a Distributing Clerk or Returns Clerk. Plaintiff's argument that the specified abilities do not qualify as skills lacks merit. *See Renner v. Heckler*, 786 F.2d 1421, 1423 (9th Cir. 1986) (skills at issue included completing receipts, inventorying and ordering, and inspecting merchandise). The ALJ also found that Plaintiff's past relevant work gave him skills transferable to work as a Sales Representative, Hardware, and Sales Person, General Hardware. Tr. 23. The ALJ stated that Plaintiff "has acquired sales work with customers and clients, explained products, and applied his own knowledge of various types of hardware." Tr. 23. He also noted that the Sales Person, General Hardware position involves estimating, and Plaintiff did estimating work at TI Northwest. Tr. 23. In sum, the ALJ specified Plaintiff's transferable skills. The Court now turns to whether those skills are adequately transferable to the identified occupations.

Plaintiff argues that the jobs the ALJ identified are substantially different from his past relevant work and thus would require more vocational adjustment than permitted under the regulations. Pl. Op. Br. 14. The ALJ instructed the VE in the various standards of transferability. Tr. 62-64. The ALJ correctly stated that industry-specific skills are less likely to transfer with only minimal vocational adjustment. Tr. 63. But the ALJ did not directly state that for someone

with Plaintiff's vocational characteristics, skills must be able to readily transfer to the identified jobs. Tr. 63-64. In his decision, the ALJ stated that he asked the VE for occupations that "require skills acquired in the claimant's past relevant work but no additional skills." Tr. 25. He then found the VE's testimony consistent with the DOT and concluded that Plaintiff could perform the four occupations the VE identified. Tr. 25. It is unclear what standard of vocational adjustment the ALJ applied. With respect to the transferability factors, the ALJ noted that the jobs the VE identified are less complex than Plaintiff's prior work. Tr. 23. This finding is not contested. It is the similarity of equipment and processes that is at issue here.

Plaintiff makes two arguments against the suitability of the hardware sales positions. First, he points out that the two hardware sales positions require selling different hardware supplies from the ones he was familiar with from his prior work. Tr. 14. Plaintiff's argument has merit. He worked in the sheet metal field. Tr. 37-39. The machine shop he co-owned built and sold gun parts. Tr. 42. At one of Plaintiff's other jobs, he "was in charge of just the sheet metal" and did not work with plumbing or heating systems. Tr. 45. Plaintiff testified, "I was doing large commercial jobs, almost my entire career." Tr. 51. He did not do home-level projects such as installing furnaces in residences. Tr. 51. He testified that he had not done refrigeration and did not know about running copper pipe or refrigerants or wiring thermostats. Tr. 51. Plaintiff developed specialized skills with particular tools and processes, and the ALJ did not follow up to confirm how easily Plaintiff's skills acquired from his work would transfer to the general hardware setting. In light of Plaintiff's testimony, this was error.[3] Second, Plaintiff argues that

---

[3] For example, while the ALJ correctly noted that Plaintiff has experience estimating and that the Salesperson, General Hardware position involves estimating, Plaintiff's experience appears to be dissimilar. The general hardware sales position description mentions "estimating amount of paint required to cover given area." U.S. Department of Labor, *Dictionary of Occupational Titles* # 279.357-050 Salesperson, General Hardware, 1991 WL 672547 (4th ed. 1991). Plaintiff worked

"the ALJ admitted that Mr. Hertel did not have experience as a sales person, where persuading prospective clients to buy particular products was involved, but merely filled and kept track of purchase orders." Pl. Op. Br. 13. Defendant counters that the job descriptions for the two sales positions do not require persuading. Def. Br. 14-15. Defendant is correct. *Id.* at 15 n.2. The ALJ did not err in concluding that Plaintiff had relevant experience in sales. General wholesale sales skills would transfer between occupations. However, given the specialized nature of Plaintiff's prior work, it is unclear whether Plaintiff would be able to readily transfer to a job selling general hardware, even if the job is less complex than his past relevant work. A remand is necessary to address this issue.

For the Distributing Clerk and Returns Clerk jobs, Plaintiff provides a description of the positions and then states that they are not similar to his past work. Pl. Op. Br. 14. Plaintiff does not explain why his work inspecting and preparing orders for customers is significantly dissimilar to preparing materials for shipment or processing returns of orders, which are variations of the same process. The Dictionary of Occupational Titles states that a Returns Clerk examines merchandise and records information about it and prepares invoices and letters related to the return. *Dictionary of Occupational Titles* # 209.587-042, Return-to-Factory Clerk, 1991 WL 671803. Plaintiff performed very similar tasks in his past work, and the ALJ did not err in concluding that Plaintiff had transferable skills. Nor did the ALJ err in concluding that Plaintiff's experience handling customer orders gave him skills transferable to the position of Distributing Clerk. This position entails assembling and preparing printed materials for mailing, recording what has been sent, and requisitioning materials. *Id.* # 222.587-018, Distributing Clerk, 1991 WL

---

in the sheet metal industry, and it is unclear whether his estimating experience in that context would readily transfer into estimating paint amounts.

672117. Plaintiff testified that at Killer Innovations, "I would actually deliver in post to the clients and I would accept the orders from the clients[.]" Tr. 44. Plaintiff has experience assembling items to specification for customers, keeping records of sales, and ordering materials. The ALJ did not err in concluding that Plaintiff had skills that transferred to the occupations of Distributing Clerk and Returns Clerk. However, "two occupations do not constitute a significant range of work." *Maxwell v. Saul*, 971 F.3d 1128, 1131 (9th Cir. 2020) (internal quotations omitted). It is thus unclear whether Plaintiff's skills are readily transferable to a significant range of work.

Plaintiff also argues that a higher age category should apply in his case. Pl. Op. Br. 15-16. The Commissioner considers whether to use the older age category in borderline situations, which are those where the claimant is "within a few days to a few months of reaching an older age category." 20 C.F.R. § 404.1563(b). Plaintiff was born on April 18, 1962. Tr. 200. The ALJ issued his decision on April 15, 2021. Tr. 26. Thus, Plaintiff turned 59 three days after the ALJ issued his decision, meaning he was a year away from falling into a higher age category. This is not a borderline situation. The ALJ applied the proper age category.

In conclusion, the ALJ erred in rejecting Plaintiff's testimony that he needed regular breaks between active tasks, and it is unclear whether Plaintiff can perform light work for 40 hours per week. The ALJ also partially erred in his transferable skills analysis because it is unclear whether the skills Plaintiff acquired in his specialized industry are readily transferable to the general hardware sales context. The Court therefore remands this case for the ALJ to address these issues.

**CONCLUSION**

Based on the foregoing, the Commissioner's decision is REVERSED and REMANDED

for administrative proceedings.

IT IS SO ORDERED.

DATED:_____July 5, 2023_____.

_____
MARCO A. HERNANDEZ
United States District Judge